Good morning. May it please the Court, my name is Guy Grandy on behalf of Yonatan ABRHA. This case is one that came to Your Honors through the BIA. The BIA denied Mr. ABRHA's claim and agreed with the immigration judge on his adverse credibility finding. The Board of Immigration Appeals had cited some discrepancies between Mr. ABRHA's testimony in court and his submitted application for asylum specifically. MS. GONZALES There were two main areas. One had to do with the interrogations, whether he was taken from home or taken from work. MR. ABRHA Yes, Your Honor. MS. GONZALES And the testimony is inconsistent on that point. Is that an issue that goes to the heart of his claim because it involves the very interrogations that form the basis of his claim? MR. ABRHA We don't believe so. There were two incidences, and he tried to explain those in court. Your Honor is correct where in the application it states that I believe he was taken from home. And in his testimony, he stated that he was taken from work. And then during the direct and cross-examination, there was some confusion. It was going back and forth. MS. GONZALES And similarly, at one point, I think in the application, he says he doesn't know who the people were. And in his testimony, he says he does know at least generically who they were. MR. ABRHA That's correct. I think what he stated was in his application, he stated that they were strangers. And when he was cross-examined on that point, because he had testified that these were the two men that had interrogated him earlier in the day on that occasion, he had clarified to the court that I didn't know who they were, implying he didn't personally know who these people were, that they were strangers to him. And again, when you take everything into context, we still assert that it doesn't go to the heart of his claim, because if you look at the interrogations that he did, that he went through, it outlines imputed political opinion and some degree of torture and abuse. MS. GONZALES Well, I guess I understand the second piece of that, that you're saying if he's believed, then there's sufficient evidence on his side of the equation. But the place from which you are dragged away, that's the centerpiece of his whole case, is that he was dragged away and interrogated. And why isn't the place from which that all starts part of the heart of the claim? MR. WANG Well, he did testify. Well, the record mentions that his family were very prominent coffee, had a coffee company in Ethiopia. And this particular, his place of business isn't really brought out in the application or in the testimony. So we don't feel that it goes to the heart, because whether one is dragged from their home or from work, in this particular instance with this respondent, it just doesn't go to the heart of his application or his claim. MS. GONZALES The other basis is his relationship with, I'm not going to pronounce this right, and there's conflicting evidence about that relationship, the names and the relative, the intervening relationship, as well as the names of those who are related to him. Would you discuss that inconsistency and whether that goes to the heart of the claim? MR. WANG Yes. Your Honor is referring to a justification document, I think is how it was described, justifying the relationship between Mr. Abra's mother and the former defense minister, Mr. Seye Abra. And in that document, which was obtained from, I think, a local office there, it states that, in fact, Mr. Abra's mother and Mr. Seye Abra, who was the former defense minister, were sisters, thus implying that they're cousins, where, in fact, during the direct testimony, appellant had stated and clarified that, in fact, Mr. Abra's maternal grandmother was, in fact, the sister of the defense minister's mother. MS. GONZALES And they gave different names than the ones he gave in his testimony, a different name than the one that appears on the document that he offered. MR. WANG They did. And his explanation for that discrepancy is that he wasn't, he didn't know Mr. Abra very well. He rarely came over to the house. He rarely discussed with his mother the genealogy between his family members. And so, and there was also a point in that testimony where he had mentioned that the defense minister's mother actually went by a nickname, I believe, which didn't appear on that form. So, it all... MS. GONZALES It was both a first and a last name that were different. MR. WANG That's correct. And so, his explanation for that discrepancy was, is that he wasn't very familiar with that side of the family. MS. GONZALES So, in your view, do we, was the finder of fact compelled to believe his explanations about these discrepancies? I can understand that one could, but our standard of review is we would have to conclude that the fact finder was compelled to believe him. MR. WANG Your Honor, I don't believe that he... MS. GONZALES For what reason should we reach that conclusion? MR. WANG I'm sorry, Your Honor, I didn't... MS. GONZALES For what reason should we reach that conclusion? MR. WANG That he was not compelled to make the decision? MS. GONZALES Well, I guess what I'm doing is just trying to point you to our standard of review, which is a very high bar for you to overcome, because if the evidence is susceptible to two different interpretations, and one of those is the one that the agency made, that's kind of the end of the line. So, why isn't that a permissible interpretation to disbelieve him on account of these significant holes in the story? MR. WANG Only because, Your Honor, I believe Mr. Abra had given the Court a reasonable explanation for the discrepancy. CHIEF JUSTICE KENNEDY Going back to the number of times he was visited by these people from the government, I have the impression that in his application he said he was only visited once, whereas in his testimony he said he was visited twice. Now, is that incorrect, or is that... That seemed to me to be a more significant discrepancy than some of this other stuff we're talking about. MR. WANG That is one conclusion, Your Honor. CHIEF JUSTICE KENNEDY Well, the IJ didn't pick it up or didn't seem to interpret it that way. MR. WANG That is one... CHIEF JUSTICE KENNEDY That would seem to me to be a fairly significant discrepancy. MR. WANG If that were indeed the case, I would agree with you, Your Honor. But I think if you took the statement in the application as a whole, within its context, in our opinion, it doesn't really clearly state that there was one or two instances. It seems to mesh together. MS. MOSS Do you have that language, Counsel? MR. WANG Your Honor, I have it at my... MS. MOSS Maybe bring it up on rebuttal, would you? MR. WANG Okay. I will. MS. MOSS Save the rest of your time now. MR. WANG I will. Thank you. MS. MOSS We'll hear next from the government. MR. LEIST Good morning. May it please the Court, my name is Jeff Leist on behalf of the government. As a point of clarification, in his asylum application, he actually says that he was very close with Sayyabra and that when the persecutors were asking him his relationship, he said that it was perfectly fine that Sayyabra would come over to his home. In his testimony, he states that when he was asked his relationship with Sayyabra, he said he told them the truth, which said he knew nothing. The immigration judge had a laundry list of discrepancies in Mr. Abra's testimony and his documentary evidence. MS. MOSS The BIA didn't agree with all of them, though, right? MR. LEIST They pointed to three specific ones. MS. MOSS Okay. MR. LEIST Which were the relationship with Sayyabra, as well as the fact that he stated in his application that he was taken from home. MR. ABRAAMS I don't know. They were pretty trivial, like whether his father died in May or April or something like that. MR. LEIST That is correct. A couple of them don't go to the heart of his claim. However, there are three major ones which do go to the heart of his claim. The first being, his relationship with Sayyabra. His claim is premised on the fact that he was allegedly persecuted, taken from his home and his work because of his relationship with this person. However, as has been discussed, there are numerous inconsistencies between his testimony and his documentary evidence. He testifies that on one page that Sayyabra's mother's name is Abraash, is what we call her, he states. The next page has three different names, all of them different for what her name is. When he's presented with his document, which he produced. MS. MADDOX Excuse me, counsel, you're talking a little bit fast.  MS. MADDOX And you're saying that he had three different names for his mother? MR. ABRAAMS For Sayyabra's mother. MS. MADDOX For, okay. MR. ABRAAMS Correct. MS. MADDOX Maybe his aunt, maybe his... MR. ABRAAMS Exactly. Whoever this person is, they have three different names for this person. When he's presented with the document, which says this woman's name is, I believe it's Alganesh Balay, he says, oh yes, that's what I meant. The document, as it has been discussed, pretty much contradicts his testimony as to how he's related to this person. He keeps saying that it's his mother's mother's sister is Sayyabra's mother. However, the document points out that his mother and Sayyabra's mother are related. They're cousins, basically. The issue is that because his entire claim is premised on his one source of outside documentation, which he got from, I believe it's the Addis Ababa city government, undercuts his testimony. When presented with this discrepancy, he actually says the document is incorrect. Therefore, because the immigration judge is presented with this differing testimony and documentary evidence, it's perfectly acceptable for him to not know which way to go on this and to make an adverse credibility determination. The second issue is who came to his home the night after his second alleged detention and persecution. His claim is that he was persecuted by members of the government. However, in his application, he states that the people who came to his home that night were strangers. On page 113 of the record, when he begins talking about this incident, he refers to them as other people. However, on page 147, which is when he begins to actually talk more deeply about this, he recognized them as the same people from earlier that morning. When I asked about this discrepancy... I don't see that quite as an inconsistency. They might be the same people, but he still didn't know who they were. So that one seemed odd to me that that was considered a discrepancy. Am I missing something? Well, it seems odd to me to refer to these people as strangers instead of saying the persecutors. I mean, it's possible that that could be one interpretation. However, the record does not necessarily compel that interpretation. Well, I guess on that one, I disagree with you. It seems that it's perfectly consistent to say they're strangers, but they're the same people that came after me earlier. It is a possible interpretation. You are correct. However, he states on page 113 that these are other people. And then when he starts talking about the incident again, he refers to them as the same people from earlier that morning. He would think that if he was referring to same people, he wouldn't refer to them as other people. Is he an English speaker? I do not believe so. Yeah, that's one of the problems in these cases. However, he does not allege any kind of interpretation difficulties or anything like that. I understand that. But when we see one of these little kind of circular things, I wonder, it seems to be it's probably a misunderstanding of language and how to say things. That is possible. And I think at the end, didn't the IJ say also he wasn't persecuted? He does say that. He says that the... Did he explain that? Not really. He says that the petitioner was detained a couple of times and beaten a couple of times. He doesn't really go into a full-fledged merits analysis. And the board also did not go into a merits analysis. So that is not available to us as a basis of decision in the government's favor, even if we thought the IJ was correct. That's correct. A third issue is the fact that petitioner's mother, who is closer related to Sayy, was able to go to the government and get this document in the first place. There's kind of an issue that if the government was cracking down on this person's relatives, that it would make sense that they would at least impede in some way his mother from getting this document. There's also no evidence that his six siblings, who are also related to Sayy Yabra, have had any problems whatsoever with the government, or that his uncle who helped him come to the United States has had any kind of problems with the government based on his relationship with Sayy Yabra. The board and the immigration judge also found that petitioner did not establish relief under the Convention Against Torture. As I just mentioned, petitioner's relatives who continue to live in Ethiopia have had no problems whatsoever with the government based on their relationship. So it does not follow that if the petitioner's returned to Ethiopia, that he would have any problems. Moreover, there's no evidence that he was in fact tortured, or that if he was returned, he would be tortured. There's a couple of sites in their brief referring to that he was tortured, but there's no actual description of any kind of torture. They cite to page 198 of the record is a document that says that Sayy Yabra's relatives have been questioned regarding corruption. However, there's no evidence that they're being tortured. And furthermore... Did the IJA say anything about torture? He bases it also on the average credibility findings, saying that... I beg your pardon? He finds that there's no torture claim based also on an average credibility finding. He also alternatively finds that because he hasn't established that he was tortured, that he would be tortured, that the claim fails. But he didn't even make a finding on persecution, let alone torture. Right. Correct. Don't you have to be persecuted to be tortured? That would. Is it possible to be tortured without being persecuted? There are no further questions. I would state that based on the forewarned reasons, the court should deny the petition for review. I don't believe we have any more questions for you. Thank you. Thank you. But Mr. Grande, you do have some rebuttal time remaining. Thank you, Your Honor. According to Respondents I-589, this is a point where Respondent talked about his relationship with Mr. Sayy Yabra. And while counsel for the government states that they were closely related, he does say that he is a close relative of mine. So I don't know if that really says that he knows him very well, but he does know that there is some sort of relationship between himself and the former defense minister. And the government brings up the fact that the immigration judge at the hearing also brought up, and that is, why would someone go to the government that is supposedly persecuting someone because of this familial relationship to get a document explaining the familial relationship? And during the testimony, Respondent explained that he was asked to corroborate this relationship by his attorney, and he sent the message through someone who had visited or was going to visit that area in Ethiopia. And so his mother, at great risk to herself, went there to obtain this document. So while Respondent's or Appellant's claim is that it's because of this imputed political relationship, this imputed political opinion and this relationship between the two, Respondent felt that there was no other way for him to obtain any kind of document purportedly showing this familial relationship. Thank you, counsel. Thank you. The case just argued is submitted, and we appreciate the arguments of both parties. Our next case on the calendar this morning is United States v. Lopez.
judges: B. Fletcher, Cudahy , Graber